Filed 2/28/25  P. v. Rivas CA3
Opinion following transfer from the Supreme Court
## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C094563 |
| Plaintiff and Respondent, | (Super. Ct. No. STKCRFDV20180013813) |
| v. | |
| ANDREW RIVAS, | OPINION ON TRANSFER |
| Defendant and Appellant. | |

Defendant Andrew Rivas appeals from his convictions stemming from a domestic violence incident involving his girlfriend that spanned eight days.  He was sentenced to an aggregate term of 28 years in prison, including the upper term on three counts and one of the enhancements.

Defendant timely appealed, arguing that one of his convictions for false imprisonment should be reversed because the victim was continuously restrained, and the People agreed.  Noting that the trial court imposed multiple upper terms during sentencing, defendant further asked us to remand for resentencing given the legislative

1

changes brought about by Senate Bill No. 567 (2021-2022 Reg. Sess.) (Senate Bill No. 567) (Stats. 2021, ch. 731, § 731). He also argued the trial court erroneously used the same factors to impose upper terms and consecutive sentences. Finally, defendant asked us to strike a $30 surcharge imposed under Penal Code section 1202.4, former subdivision (*l*).[1]

In an unpublished opinion issued on September 7, 2023, this court reversed one of defendant's convictions for false imprisonment, ordered the trial court to recalculate the related fees, and strike the $30 surcharge. As to defendant's arguments regarding Senate Bill No. 567, we concluded defendant had not demonstrated prejudicial error requiring reversal, so we affirmed the judgment as modified.

Defendant sought review in our Supreme Court, which ordered this court to vacate the previous opinion and reconsider the matter in light of *People v. Lynch* (2024) 16 Cal.5th 730 (*Lynch*). Having done so, we now conclude that remand for a resentencing hearing is required.

We will reverse one of defendant's convictions for false imprisonment, vacate defendant's sentence, and remand the matter for full resentencing, including imposition of fines and fees. In all other respects, we will affirm the judgment.

## I. BACKGROUND

### A.    *Defendant's Relationship with the Victim*

Defendant and the victim began dating in May 2018. She moved in with him in August 2018. A few weeks later, defendant's pregnant sister and three children moved in with defendant and the victim. The sister gave birth to twins in September 2018. After the sister moved in, defendant angered more easily.

---

[1] Undesignated statutory references are to the Penal Code.

Defendant was "really particular" about the house and "[e]verything had to be in its place when he got home." The victim was responsible for cleaning and tidying the home, and defendant got mad if there was any kind of mess. For example, soon after defendant's sister moved in, the victim splattered grease while cooking, and defendant grew so enraged that he slapped her. Defendant also got mad if anyone tracked in dirt or water from outside.

Defendant was violent with the victim other times. In August 2018, right after she moved in, the two of them started arguing while they were coming home from dinner. Defendant suddenly punched her between the eyes, and the victim felt everything go "black." The victim tried to get out of the car, but defendant grabbed her and hit her again. Defendant drove them home. When they arrived home, the victim attempted to run. Defendant grabbed the victim by her hair and pulled her into the house. Concerned she would have a black eye, defendant warned he would be in trouble if she went to the police and told her not to go to work. Embarrassed by her visible injuries, the victim quit her job. In October 2018, he slapped, kicked, and punched her as they were coming home from a movie. Another time, defendant threw a phone at her so hard that she suffered bruises.

After the physical incidents, defendant would apologize and say he would not hurt her again. He gave her money, furniture, and flowers. Occasionally he would cook. The victim hoped this meant he was working on his anger.

Defendant checked the victim's cell phone multiple times every day, looking at her messages and history. On two separate occasions, he broke two different phones of the victim's by snapping them in half, throwing one of them over the backyard fence. After, defendant bought her new phones.

B. *Incident Starting October 26 Through November 2, 2018*

The victim started a new job on October 26, 2018, over defendant's objection. Defendant said he would "black" both of her eyes so she would not work. Defendant

3

seemed angry when he dropped her off at work that morning, complaining he would now be late for his work. Defendant asked the victim to call him during her lunchtime and breaks.

After work, the victim returned home and made food for herself and defendant's sister. Defendant arrived home later that evening and became enraged when he found dirty dishes in the kitchen sink. Defendant slapped her in the face so hard that her ears rung and she saw flashes. The victim hit defendant back, and defendant then followed her to the bedroom. He hit and kicked her, and she passed out.

When she finally woke up, she found herself on the floor in pain and with blood "pouring out of" her nose and mouth. She could not see out of one of her eyes, and everything looked blurry out of her other eye because her contacts had been knocked out. Defendant grabbed her by her shirt, dragged her to the bathroom, and turned the shower on her. The victim begged defendant's sister, who was standing nearby, to call the police, but defendant said not to. Instead, defendant asked his sister to go to the store to buy alcohol and pain medication for the victim, and the sister left. Defendant complained about the mess from the blood.

When she finished the shower, the victim got dressed and ran out of the house. Before she could get to the front gate, defendant grabbed her by the back of her hair, threw her to the ground, and kicked her repeatedly in the stomach. He kicked her so hard that she urinated. Defendant then dragged her by her hair back into the house. He said he was sorry and then went to the kitchen to make an ice pack. The victim tried to leave again, but defendant caught her by the hair. She fell, and defendant beat her again, this time more severely. Defendant then dragged her back into the house, put her in the bedroom, and closed the door. The victim feared defendant was going to kill her.

The victim tried to leave again, this time through the bedroom window. Defendant entered the bedroom and pulled her by the leg toward the bed, causing her to fall in the process. Defendant demanded she look at him and then hit her with her cell

4

phone, striking her directly in her right eye and causing the victim "a tremendous amount of pain." The victim had previously told defendant she had significantly better vision in her right eye, and he said, " 'And that's your good eye too, isn't it?' " Defendant then warned her that she was " 'not going anywhere.' " The victim protested she was in pain, and defendant gave her a handful of over-the-counter painkillers and some liquor to wash them down. Defendant then sat in front of the bedroom door.

The victim tried to go to sleep, but defendant came in and laid down with her on the bed. He said her face looked like " 'hamburger meat.' " The victim fell asleep but woke up to defendant having intercourse with her. The victim was in severe pain and asked him to stop, but he continued. Her breathing became shallow.

The next day, defendant called in sick to work and stayed home. The victim was "in and out," and in a lot of pain. She still could not see out of her right eye, and it felt as though it had swollen shut. Defendant repeatedly gave her pills with alcohol. The victim continued to fear for her life.

Defendant also stayed home the following day (Sunday, October 28). The victim was still in so much pain that she could hardly move, and she was unable to eat or urinate. She again asked to go to the doctor, but defendant said he would have to "think about it," because he was afraid of getting into trouble. Instead, he wrapped her head in a bandage, applied Neosporin, and gave her pain pills. At one point, she again woke up to defendant having intercourse with her. He again ignored her pleas to stop. After he was done, defendant asked if it had hurt, and the victim replied yes. Defendant gave her more pills.

The next day (Monday, October 29), defendant asked his sister to look after the victim, because he had to leave for work. Defendant offered to forgive some money she owed him. After defendant left, the sister came into the bedroom and promised to call the police if defendant hit the victim again. But, she could not let the victim leave because defendant "need[ed]" the victim there. Defendant returned later that day and forced the

5

victim to take a shower, even though it hurt her. The victim felt defendant was waiting for her to die. She fell asleep and again awoke to defendant having intercourse with her. She again asked him to stop, saying she was in a lot of pain, but he ignored her. Defendant again gave her pills and beer.

The following day (Tuesday, October 30), defendant again asked his sister to look after the victim, so he could go to work. Before he left, he gave her more pills and beer. Later that day, the victim's friends came looking for her, but defendant's sister lied and said the victim was not there. That evening, defendant forced the victim to eat, even though her jaw was swollen and in pain. She fell asleep and again woke to defendant having intercourse with her, ignoring her request to stop because of the pain. Defendant instructed her to continue asking him to stop.

On October 31, defendant forced the victim to have a bath. As she was bathing, he told her that his mother had died in that bathtub.

On November 1, the victim was able to reach one of her friends and ask to be picked up the next day, after defendant had left for work and the sister had left to drop her kids off at school. That day, defendant stopped giving the victim pain pills because she questioned whether they were the same pills as before. Later that night, defendant again forced the victim to have sexual intercourse with him.

On November 2, defendant slapped the victim on the side of the head. The sister ignored the victim's requests to call the police. Later that morning, the victim's friend picked her up and took her to the hospital. The victim was treated for a right orbital fracture, broken nose, and a ruptured eardrum. The victim required surgery to remove her right eye, and she required a prosthetic eye. She also suffered a brain injury. At trial, a radiologist opined that the victim's injuries were due to blunt force trauma.

As a result of her injuries, the victim is unable to drive, cook, or work. She suffers from nightmares and only sleeps with the lights on. She also has trouble breathing.

At trial, evidence was introduced that defendant had committed multiple prior acts of domestic violence. One of defendant's ex-wives testified that he hit her in front of her then two-year-old daughter. Another ex-wife testified defendant had hit and kicked her.

Defendant testified that he argued with the victim due to her alcohol consumption. He denied ever raping or torturing the victim, and claimed the victim hit him first, so he punched her back two times in the face "to get her off of [him]." He invited her to leave and offered to take her to the hospital, but she refused because he would not stay with her. During his testimony, he also admitted to three domestic violence convictions: (1) a 2006 conviction for hitting his first ex-wife in the arm and mouth; (2) a misdemeanor domestic battery conviction for hitting his second ex-wife; and (3) a conviction for pulling a necklace off his second ex-wife's neck. He also admitted to: (1) a 2015 conviction for committing a lewd act on a child less than 10 years younger than him; (2) a 2010 felony conviction for being a prohibited person in possession of a firearm; and (3) a conviction for disturbing the peace. He additionally admitted to being sent to a 52-week batterer treatment program after his 2006 conviction, and then a second 52-week batterer treatment program after a subsequent domestic violence conviction. He further admitted that he had knowingly violated a restraining order in favor of one of his ex-wives.

C.      *Charges Filed and Jury Verdict*

Defendant was charged with false imprisonment by violence (§ 236—count 1), two counts of corporal injury to a cohabitant (§ 273.5, subd. (a)—counts 2 & 3), four counts of rape by force or fear (§ 261, subd. (a)(2)—counts 4-7), aggravated mayhem (§ 205—count 8), torture (§ 206—count 9), kidnapping (§ 207, subd. (a)—count 10), and criminal threats (§ 422, subd. (a)—count 11). As to counts 2 and 3, it was further alleged defendant inflicted great bodily injury (§ 12022.7, subd. (e)). Enhancements pursuant to section 667.61 were alleged as to counts 4 through 7.

7

During closing argument, the prosecutor explained that count 2 "specifically cover[s] the conduct that's involved when [the victim testified that defendant] came at her with both fists and a foot, . . . striking her in the face, rendering her unconscious. And when she awoke, she was pouring blood, I believe she described it as a waterfall coming from her nose and her mouth." The prosecutor continued, "the two punches and the kick is the conduct that is covered in [c]ount 2." She further explained that the great bodily injury related to count 2 was the "gushing blood," broken nose, and loss of consciousness.

In March 2021, a jury found defendant guilty of counts 1 through 4 and 7. The jury convicted defendant of the lesser included offenses of simple mayhem (§ 203) in count 8 and false imprisonment (§ 236) in count 10. The jury found the great bodily injury allegations to be true, but the section 667.61 allegations to be not true. The jury hung on the remaining counts, and, based on a motion by the prosecution, the court dismissed them.

D.    *Sentencing*

In July 2021, the trial court sentenced defendant to an aggregate term of 28 years in prison, as follows: the upper term of four years for count 2 plus the upper term of five years for the great bodily injury enhancement (or nine years total); eight months (one-third the midterm) consecutive for count 1; one year (one-third the midterm) consecutive for count 3 plus 16 months (one-third the midterm) consecutive for the great bodily injury enhancement; and the upper term of eight years consecutive for each of counts 4 and 7 (or 16 years total). The trial court imposed, but stayed pursuant to section 654, an eight-year upper term on count 8 and a two-year midterm on count 10. The trial court imposed a $300 restitution fine (§ 1202.4) plus a 10 percent surcharge (§ 1202.4, former subd. (*l*)), a corresponding $300 parole revocation fine (suspended unless parole is revoked) (§ 1202.45), a $40 per count court operations fee (or $280 total) (§ 1465.8, subd. (a)(1)),

and a $30 per count criminal conviction assessment fee (or $210 total) (Gov. Code, § 70373).

During the sentencing hearing, the court noted it had reviewed the probation report, which listed two felony and seven misdemeanor convictions between 2006 and 2017, including two misdemeanor convictions for misdemeanor corporal injury to a spouse or cohabitant (§ 273.5, subd. (a)) and one conviction for felony lewd or lascivious acts (§ 288, subd. (c)(1)). The report stated the source of its information regarding defendant's criminal history was the California Bureau of Criminal Identification and Investigation. Although the section of the report listing defendant's criminal history did not list any parole or probation violations, the report stated defendant's prior performance on probation was unsatisfactory, presumably because defendant was on probation at the time of the crimes at issue here. In addition, the report stated defendant showed remorse for his actions.

The court found no mitigating factors and multiple aggravating factors. Despite the statement in the probation report, in the court's opinion, defendant had shown no remorse. He had openly mocked and laughed at the victim, even as she was visibly upset and crying throughout her testimony and required many breaks. He also laughed about his prior relationships and instances of domestic violence, and he appeared to be manipulative. Moreover, defendant had several prior domestic violence and sexual offenses, yet he "continues with this behavior." Despite the services he had been offered, he continued to "reoffend[ ] even worse [than] his prior offense." He had shown himself to be a danger to society and "any female he may choose to have a relationship with."

In addition, the court noted: "The crime involved great violence, great bodily harm, threat of great bodily harm or other acts disclosing a high degree of cruelty, viciousness, [and] callousness. . . . [¶] He did cause great injury to the victim, caused her to lose her eye over multiple days that the offenses were committed. She asked, according to the evidence, to be taken to the doctor. He refused based on his own

9

interest. The victim was particularly vulnerable. At the time of the rapes, she had her eyes bandaged, was in pain. [¶] Also, at the time of the incident with the phone hitting her in the eye . . . , she had already been abused and was bleeding." The court further found that defendant: (1) was engaging in violent conduct that indicated a serious danger to society; (2) had numerous prior convictions as an adult that were of increasing seriousness; (3) had multiple prior convictions for domestic violence; and (4) had a prior sexual conviction which required registration as a sexual offender pursuant to section 290. In addition, probation had determined that defendant had an above average risk to reoffend, and defendant had previously performed poorly on probation. Still, noted the court, no paperwork had been submitted regarding any probation violation, presumably because the probation department thought defendant's probation had been terminated.

The prosecutor asked the court to clarify which aggravating circumstances it was relying on in selecting the upper terms for the substantive offenses and the great bodily injury enhancement, warning that the court could not use either the elements of the offense or the enhancements to select the upper term. The court replied, "I'll clarify it right now. On the underlying offenses, it's based on the defendant's history of increasing domestic violence, multiple domestic violence offenses [, and] with regard to the enhancement . . . [i]t is based on the viciousness of the great bodily injury suffered by the victim."

## II. DISCUSSION

### A.   *Senate Bill No. 567*

In our prior opinion, this court determined that, while Senate Bill No. 567 applied retroactively to defendant's nonfinal judgment, remand for resentencing was not required because the jury would have found at least three aggravating factors true beyond a reasonable doubt thus satisfying federal constitutional considerations. As to the state law error, it was not reasonably probable that defendant would have received a lesser sentence because it was reasonably probable that the jury would have found true four out

10

of the eight aggravating factors relied upon by the trial court. Our Supreme Court ordered this court to reconsider defendant's request for resentencing in light of *Lynch*. Having done so, we now conclude that we must reverse defendant's sentence and remand for a full resentencing in compliance with Senate Bill No. 567.

As explained in *Lynch*, "The Sixth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment's due process clause, 'provides that those "accused" of a "crime" have the right to a trial "by an impartial jury." This right, in conjunction with the Due Process Clause, requires that each element of a crime be proved to the jury beyond a reasonable doubt.' [Citations.] In the context of California's determinate sentencing scheme, *Cunningham v. California* (2007) 549 U.S. 270 (*Cunningham*) held that, 'under the Sixth Amendment, any fact that exposes a defendant to a greater potential sentence must be found by a jury, not a judge, and established beyond a reasonable doubt, not merely by a preponderance of the evidence.' (*Id*. at p. 281.) 'Inhering in that guarantee is an assurance that a guilty verdict will issue only from a unanimous jury.' " (*Lynch, supra*, 16 Cal.5th at p. 742.)

Effective January 1, 2022, when a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the trial court must impose a term not exceeding the middle term unless there are circumstances in aggravation that justify the imposition of a term exceeding the middle term and the facts underlying those aggravating circumstances: (1) have been stipulated to by the defendant; (2) have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial; or (3) relate to the defendant's prior convictions and are based on a certified record of conviction. (§ 1170, subd. (b)(1)-(3); Stats. 2021, ch. 731, § 1.3.) This amendment has been uniformly applied retroactively to defendants whose judgments were not final on direct appeal at the time the statute took effect. (*Lynch, supra*, 16 Cal.5th at pp. 742, 746.)

However, appellate courts were divided as to when it was necessary to remand for resentencing. (*Lynch, supra*, 16 Cal.5th at pp. 742, 746.) As the *Lynch* court clarified, "a

11

court reviewing a case where the former version of section 1170[, subdivision ](b) was employed must apply the *Chapman* standard of review." (*Lynch, supra*, at pp. 742-743, citing *Chapman v. California* (1967) 386 U.S. 18.) As such, "in a case where the judgment is not yet final, a sentence imposed under former section 1170[, subdivision ](b) must be reversed and remanded unless the reviewing court concludes beyond a reasonable doubt that a jury, applying that same standard, would have found true all of the aggravating facts upon which the court relied to conclude the upper term was justified, or that those facts were otherwise proved true in compliance with the current statute." (*Lynch, supra*, at p. 743.)

Here, the trial court imposed the upper term on counts 2, 4, 7, and 8, and the great bodily injury enhancement associated with count 2 after identifying eight aggravating factors supporting that term: (1) defendant's prior convictions as an adult were numerous and increasing in seriousness (Cal. Rules of Court, rule 4.421(b)(2)),[2] (2) defendant had shown no remorse, (3) defendant had shown himself to be a danger to society (rule 4.421(b)(1)), (4) the crime involved great violence and a high degree of viciousness (rule 4.421(a)(1)), (5) the victim was particularly vulnerable (rule 4.421(a)(3)), (6) defendant had multiple prior convictions for domestic violence, (7) defendant had a prior conviction that required him to register as a sex offender, and (8) his prior performance on probation supervision was unsatisfactory (rule 4.421(b)(5)). None of these aggravating circumstances were determined by a jury, a court trial, or stipulated to by defendant.

In light of *Lynch's* guidance that this court must find beyond a reasonable doubt that each of these factors either complies with the amendments to section 1170, subdivision (b) or would have been found by a jury beyond a reasonable doubt (*Lynch, supra*, 16 Cal.5th at pp. 743, 768), we turn first to factor two, namely that defendant had

[2] Undesignated rule references are to the California Rules of Court.

shown no remorse. We find it significant that the probation officer and the trial court came to different conclusions as to whether defendant showed remorse. Given that two different entities disagreed on the issue, we cannot say that a jury would have found true beyond a reasonable doubt that defendant failed to show remorse.

We further note that the only evidence supporting factor eight (i.e. defendant's prior performance on probation supervision was unsatisfactory) was the probation report, which listed no probation violation other than defendant's commission of the instant offenses while he was on probation. Yet, as the trial court noted during sentencing, no probation violation paperwork had been filed with respect to the instant offenses. Moreover, the trial court made this finding without the benefit of a certified criminal record. Under the circumstances, we also cannot say that a jury would have found factor eight true beyond a reasonable doubt. Under *Lynch*, we must reverse defendant's sentence and remand for a resentencing hearing. (*Lynch, supra*, 16 Cal.5th at p. 768.)

As explained in *Lynch*, the "proceedings on remand are to be conducted in accordance with the current statutory requirements and the defendant given the opportunity for the jury trial, of which he was deprived. [Citations.] On remand, the parties remain free to introduce at trial all relevant evidence to support or contest the factual support for the aggravating circumstances set out in the California Rules of Court. The court may rely on any properly proven aggravating facts, including prior convictions or facts necessarily found by the jury to support a verdict on underlying counts and enhancements. The court retains its discretion to impose an upper term sentence if it concludes that one or more properly proved circumstances justify such a sentence. (§ 1170[, subd.] (b)(2).) If it cannot so conclude, it may impose no more than a middle term." (*Lynch, supra,* 16 Cal.5th at pp. 777-778.)

B.      *False Imprisonment Conviction*

Our previous analysis regarding defendant's two convictions for false imprisonment has not changed and is reproduced herein. Defendant argues that one of

13

his convictions for false imprisonment should be reversed because the victim was continuously restrained. The People agree, and so do we.

False imprisonment occurs when a person is " ' "compelled to remain where he [or she] does not wish to remain, or to go where he [or she] does not wish to go." ' " (*People v. Reed* (2000) 78 Cal.App.4th 274, 280.) False imprisonment is a lesser included offense of kidnapping, and therefore should be similarly treated as being a continuing offense until such time as the defendant releases the victim. (See *People v. Jandres* (2014) 226 Cal.App.4th 340, 362 [false imprisonment is a lesser included offense of kidnapping]; *People v. Barnett* (1998) 17 Cal.4th 1044, 1159 [kidnaping is a continuing offense so long as the detention continues].) Where there was a single abduction followed by a continuous period of detention, a defendant cannot be convicted of two counts of false imprisonment. (See *People v. Thomas* (1994) 26 Cal.App.4th 1328, 1335 [reversing one of the defendant's two kidnapping convictions where the period of detention was continuous].)

Here, nothing severed the course of conduct that would give rise to separate detentions and support two false imprisonment convictions. From the time of the first beating on October 26, defendant kept the victim continuously detained in the home until her final escape on November 2. He thwarted each of her three earlier attempts to leave, beating her with increasing severity after each attempt. He then enlisted his sister to watch the victim when he needed to leave the house for work. The sister had previously ignored the victim's requests to call the police, and she turned the victim's friends away when they came to find her on October 30. Because there is no indication the victim ever felt free to leave between October 26 and November 2, we will strike the conviction on count 10, false imprisonment.

Although in our prior opinion we ordered the trial court to revise the calculation of the court operations fee and criminal conviction assessment fee, given that we are already

14

vacating the sentence and remanding the matter for a full resentencing, it is unnecessary to do so here.

For similar reasons, we also no longer need address defendant's argument that the trial court violated the prohibition against the dual use of sentencing factors in imposing an upper term sentence on counts 2, 4, and 7 and consecutive sentences. Nor need we address defendant's request that we strike the $30 surcharge imposed pursuant to section 1202.4, former subdivision (*l*).

### III.  DISPOSITION

Defendant's conviction on count 10 is reversed. Defendant's sentence is reversed, and the matter remanded for resentencing consistent with this opinion. Following resentencing, the trial court shall prepare a new abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation. The judgment is otherwise affirmed.

/S/

_____
RENNER, J.

We concur:

/S/

_____
HULL, Acting P.J.

/S/

_____
BOULWARE EURIE, J.

15